United States District Court
District of Massachusetts

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. |
| DAVID GEOFFRION, JOSHUA JOHNSON, | ) | 10-10017-NMG |
| MAXIMO LARYI HERRERRA PENA, JOEL | ) | |
| LICEAGA and VICTOR MANON, | ) | |
| Defendants. | ) | |

MEMORANDUM & ORDER

**GORTON, J.**

Defendant Maximo Laryi Herrerra Pena, a.k.a., Emerson Adams ("Pena") is to be sentenced by this Court for the crimes of conspiracy to possess with the intent to distribute and to distribute heroin, in violation of 21 U.S.C. § 846 and 841(a)(1), (b)(1)(B) (Count I), and aiding and abetting in the distribution of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (Count II). The government seeks to enhance Pena's sentence under 18 U.S.C. § 841 to a mandatory minimum of 20 years imprisonment because death purportedly resulted from the use of the heroin distributed.

On July 19, 2012, this Court convened an evidentiary hearing on the question of death resulting at which it heard testimony and received evidence. It now concludes that the government has established, by a preponderance of the evidence, that death did

result from the criminal conduct of the defendant whose sentence will be enhanced accordingly.

I.  **Background**

The death-resulting allegation pertains to the defendant's alleged role in distributing heroin to Chelsea Joslin ("Joslin"). The government contends that on July 30, 2009, Pena arranged for a quantity of heroin to be supplied to his co-defendant, Joshua Johnson ("Johnson"). Following that transaction, Johnson purportedly returned to his home in Dennis, Massachusetts to cut and package the heroin obtained. Later that evening, Johnson and another co-defendant, David Geoffrion ("Geoffrion"), sold a portion of that heroin to Joslin.

After purchasing the heroin from Johnson and Geoffrion, Joslin spent the evening on the town with friends. At approximately midnight, she returned home to her residence in Brewster, Massachusetts and knocked on her mother's bedroom door to say that she was home. The following afternoon, Joslin's mother discovered Joslin lying in her bedroom, unconscious, and called 911. A paramedic arrived at the residence shortly thereafter and pronounced Joslin dead. The Brewster police found a needle and an empty packet of what appeared to be heroin on Chelsea's nightstand as well as two prescription bottles, one for Levaquin (an antibiotic) and one for Citalopram (an antidepressant).

## II. Evidence of Resultant Death

The evidentiary hearing was held primarily to determine whether 1) use of the particular heroin caused Joslin's death and 2) the heroin that Joslin ingested was originally supplied by the defendant or members of his conspiracy. Eighteen exhibits were admitted, and the Court heard testimony from three witnesses: Dr. Henry M. Nields, the medical examiner who determined Joslin's cause of death, Johnson and Asa Morse, a Special Agent for the Drug Enforcement Administration ("DEA") assigned to investigate this case.

### 1. Cause of Death

Dr. Nields testified as to Ms. Joslin's cause of death. He has been the Acting Chief Medical Examiner with the Office of the Chief Medical Examiner, Commonwealth of Massachusetts, since 2007. Dr. Nields estimates that he has personally performed over 4,000 autopsies since he first became a medical examiner in 1995.

Dr. Nields performed the autopsy of Ms. Joslin on August 3, 2009, three days after she was pronounced dead. He detected "mild to moderate advanced" decomposition of the body. Prior to performing the autopsy, he reviewed the "call-in sheet" which described the purported details surrounding Ms. Joslin's death. He learned that Ms. Joslin had been found dead in her residence and that there were drug paraphernalia near her body. That information did not significantly influence the way in which he

performed the autopsy or cause him to deviate from standard procedure. Dr. Nields also reviewed a separate police report.

The doctor began with an external examination of the body, noting general physical characteristics and looking for signs of disease or injury. He then proceeded to an internal examination of the body, retrieving some bloody fluid from the chest cavity, vitreous humor (fluid found in the eye) and gastric contents for purposes of toxicology testing.

The fluid samples were delivered to the toxicology lab at the University of Massachusetts Medical Center, and a toxicology report was subsequently generated on August 29, 2009. The blood taken from the chest cavity indicated the presence of 1) ethanol (0.18 percent), 2) 6-acetylmorphine and free morphine (indicating heroin use), and 3) citalopram, an antidepressant. The sample from the vitreous humor indicated a slightly lower concentration of ethanol (0.66 percent). The gastric contents were not tested because they ordinarily are not germane to cause of death.

Dr. Nields prepared a written autopsy after his examination in which he diagnosed the cause of death as "acute intoxication by the combined effects of ethanol, opiates and citalopram." The death certificate cites the same cause of death and estimates that the interval between the initial taking of drugs and death was "minutes". Dr. Nields explained that "minutes" usually means that death likely resulted within an hour.

Based upon the autopsy, the toxicology report and his review of the call-in sheet and police report, Dr. Nields testified before the grand jury, and again at the recent evidentiary hearing, that it is his opinion to a reasonable degree of medical certainty that the use of heroin "played a significant causal role" in Joslin's death. He stated that, in all likelihood, the level of ethanol or Citalopram in her system would not, by themselves, have caused the death of a woman of similar size and age. He further testified that the two substances in combination would not likely have caused death but admitted he could not altogether rule out that possibility.

In any event, he concluded that the combination of all three substances caused Joslin's death in this case. He testified that those substances all act as respiratory depressants, especially in combination. As a practical matter, therefore, he stated that one simply cannot discount the level of the opiates and the combined affect of all substances present in her system. In fact, Dr. Nields testified that the amount of the heroin alone in Joslin's system was probably sufficient to cause her death.

On cross-examination, Dr. Nields admitted that a blood sample retrieved from the chest cavity is less reliable than that retrieved from the femoral vessels or from the heart. He stated that he would have drawn a sample from those areas if it had been possible. He also testified that he did not know 1) the sequence

in which Ms. Joslin ingested the various substances found in her system, 2) whether suicide ideation was a side effect of her prescription medication or 3) when her prescriptions had last been filled or how many pills were missing.

**2. Origin of the heroin ingested**

Johnson and Special Agent Morse testified about the origin of the heroin discovered in Joslin's bedroom. The government also submitted telephone and cellular site records, statements made by Johnson and Geoffrion during interviews with law enforcement officers and a transcript of Johnson's grand jury testimony.

Pena has admitted to assisting in, or arranging for, the distribution of heroin to Johnson on July 30, 2009. Johnson, in turn, identifies Pena as his source for the heroin which he and Geoffrion distributed to Joslin on July 30, 2009, the use of which resulted in her death. Johnson and Geoffrion have both pled guilty to distributing, and conspiracy to distribute, the heroin that resulted in the death of Ms. Joslin.

Johnson has entered into a plea agreement which provides that the government will file a motion for a downward departure in sentencing if Johnson provides substantial assistance in the investigation or prosecution of the case. He was interviewed by law enforcement three times between May and December, 2010. He testified before the grand jury on November 18, 2010 and again at

the evidentiary hearing before this Court in July, 2012.

Johnson admits he is a long-time drug user. In the summer of 2009, he reports using heroin, cocaine and marijuana as well as selling heroin and occasionally cocaine. He stated that he had two heroin suppliers: the defendant, whom he knew as "E" or "Emerson", and Edwin Rivera ("Rivera").

Johnson testified that Pena was his primary heroin supplier in the summer of 2009. When placing an order with him, Johnson would call a phone number programmed into his phone, and the person who answered would either initiate a three-party call with Pena or would have Pena call him back using a blocked number. Johnson would place an order for heroin directly with Pena and then meet with Pena's "runner" to collect it. The exchange generally occurred in Duxbury, Massachusetts but occasionally occurred in Braintree. Although Johnson asserts that he obtained the heroin from the same runner each time, he was subsequently unable to identify that runner in a photo array.

Johnson states that, when Pena was unavailable, he would buy heroin from Rivera. Rivera was his alternate supply source and also a personal friend. In fact, during late August and September, 2009, Johnson lived with Rivera. When placing an order for heroin with Rivera, Johnson would call him numerous times to set up the transaction to ensure that Rivera would be there on time. He estimated that his transactions with Rivera

typically entailed 20 or more telephone calls. The exchange would generally occur in Boston.

Despite Johnson's characterization of Rivera as his "back-up" supplier, it appears, based upon telephone records, that Johnson purchased heroin from Rivera more often than from Pena in July, 2009. In fact, the high volume of calls between Johnson and Rivera on July 28 and 29, 2012 (34 calls and 26 calls, respectively) indicate that Johnson purchased heroin from Rivera on those dates.

Johnson testified, however, that he is certain it was Pena from whom he bought heroin on July 30, 2009 because, for the first time in his career as a drug distributor, one of his clients (Joslin) died after using. Johnson states that, in retrospect, he was afraid he would be implicated in Joslin's death and thus retained a vivid memory of who supplied the heroin he sold to her that day. He remembers meeting with one of Pena's runners in Duxbury and purchasing 10 grams of heroin. Johnson initially reported meeting Pena's runner at approximately noon but later claimed, upon review of call records provided by the government, that the meeting occurred about 2:00 p.m. Johnson explained that, after obtaining the heroin, he drove back to Cape Cod and probably used heroin in the car ride and once again after arriving at home.

Johnson purportedly then cut and bagged the heroin for

distribution. Geoffrion came to his residence at some point that afternoon or evening and arranged for the two of them to sell heroin to Joslin. They met her in Brewster at approximately 7:00 p.m. and sold her a "fifty" bag (0.2 grams) of heroin for $50.

Johnson cannot recall the color of the bag of heroin he sold but initially stated it would have been blue or green pursuant to his usual practice. After seeing the photograph of the clear bag discovered on Joslin's nightstand, however, he recalled that in the summer of 2009 he had run out of blue and green bags and had bought clear bags which he might have used to package the heroin. The bag in the photograph, he admitted, was the same kind of clear bag he used during that period.

Special Agent Morse testified that Johnson's version of his drug transaction with Pena on July 30, 2009 is supported by telephone toll and cellular site records which show the time and general location of incoming and outgoing calls. According to S.A. Morse, those records indicate that Johnson contacted Pena's organization at 12:18 p.m., received a return call from a blocked number at 12:47 p.m., and then obtained the heroin in Duxbury between 1:50 and 2:00 p.m. S.A. Morse further testified that the records indicate that Johnson traveled off Cape Cod only once on July 30, 2009 before selling heroin to Joslin and that his final destination was Duxbury. While en route, S.A. Morse averred, Johnson participated in five calls with Pena's organization.

Based on subsequent calls reflected in the toll records, Johnson appears to have traveled southbound, spent a couple of hours in the Plymouth area and then returned to the Cape at approximately 5:00 p.m. Johnson testified, however, that he returned straight home to the Cape and has no recollection of stopping in Plymouth.

Although the call records indicate that Johnson was also in communication with Rivera on July 30, 2009, S.A. Morse asserts that the volume of calls was inconsistent with a drug transaction. Johnson explained to him that they were likely just social calls.

Mr. Morse also testified that the call records indicate that Johnson transacted a second drug deal with Pena's organization later in the evening of July 30, 2009, after the sale of drugs to Joslin had transpired. To consummate that transaction, Johnson traveled from Cape Cod to the Roxbury section of Boston. S.A. Morse stated he discovered during the course of the investigation that members of Pena's organization were reluctant to travel to Duxbury at that hour because they were more likely to be noticed by law enforcement officers. Johnson did not indicate to law enforcement, however, that he ever drove, or was in the habit of driving, to Boston to transact nighttime drug deals with Pena's organization.

## III. **Findings**

With respect to Joslin's cause of death, the Court finds the testimony of Dr. Nields to be credible. The Court has taken into account Dr. Nields' acknowledgment that a fluid sample from the chest cavity is often less reliable than other parts of the body and his uncertainty with respect to the potential side effects of Ms. Joslin's prescription medications. Nevertheless, the Court finds his determination of the cause of death to be reliably based upon his experience, his appropriate methodology and his conscientious examination of all of the forensic evidence available to him. Thus, the record as a whole compels the conclusion that, more likely than not, Joslin died from acute intoxication by the combined effects of ethanol, opiates and citalopram, i.e., that the heroin used played a significant causal role in her death.

The Court also concludes that the evidence establishes, by a preponderance of the evidence, that the heroin Joslin ingested was originally supplied by Pena, or other members of his conspiracy, in light of 1) the defendant's admission that he assisted in, or arranged for, the supply of heroin to Johnson on July 30, 2009, 2) telephone and cellular site records which confirm that Johnson communicated with Pena's organization that afternoon and traveled to Duxbury to consummate the planned transaction, and 3) statements and testimony from Johnson.

The Court is mindful that Johnson cannot recall several key details of the fateful day and, over the course of the investigation, has made some conflicting statements. For example, his testimony about the time of day he obtained the heroin which he later distributed to Ms. Joslin and the color of the bag in which the heroin was packaged wavered. He claimed not to recall stopping in Plymouth on his way back from Duxbury while call records indicate he was there for several hours. He also did not inform law enforcement officers that, at night, he might be called upon to transact a deal with Pena's organization in Boston rather than on the South Shore. Furthermore, even though Johnson claimed to have obtained heroin from the same "runner" for each drug transaction, he was subsequently unable to identify that runner in a photo array.

The Court has also accounted for the fact that Johnson is an habitual drug abuser with a substantial criminal record and has a possible motive to lie to protect his friend and "alternate" drug supplier, Rivera.

Nevertheless, the Court credits Johnson's testimony that, on July 30, 2012, he bought heroin from Pena's organization and later distributed that heroin to Joslin. Johnson has consistently testified that he had no heroin on July 30, 2009 except what he obtained from Pena's organization and that he did not stockpile quantities of heroin. His testimony in that

respect is corroborated by 1) Geoffrion, who confirmed that Johnson's drug habit was such that he never stored heroin from one day to the next, 2) S.A. Morse, who testified that, in his experience, users/distributors of heroin at Johnson's level typically do not stockpile, 3) Pena's admission that he arranged for heroin to be supplied to Johnson that day and 4) Johnson's own actions, in that, if he had been in possession of a substantial amount of heroin on July 30, 2009, it is unlikely he would have made a trip from the Cape to Duxbury to buy more.

Furthermore, the call and cellular site records, as analyzed by Special Agent Morse, reliably indicate that Johnson communicated several times with members of Pena's organization on the afternoon of July 30, 2009 and traveled to Duxbury to consummate the sale. The pattern of his telephone calls and the location of the meeting are most consistent with his practice of transacting business with Pena's organization, not Rivera.

In summary, having duly considered and weighed all the evidence presented, the Court finds that the government has established that it is more likely true than not true that use of the heroin distributed by the defendant resulted in the death of Ms. Joslin.

**ORDER**

In accordance with the foregoing, the Court concludes that the government has proved, by a preponderance of the evidence, that the distribution of heroin to which the defendant pled guilty resulted in the death of Chelsea Joslin. The sentencing hearing is scheduled for Thursday, October 11, 2012 at 3:30 p.m.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated August 15, 2012